261 P.2d 924

## WHITE v. NATIONAL POSTAL TRANSPORT ASS'N.

No. 7829.

Supreme Court of Utah.

Oct. 16, 1953.

Fabian, Clendenin, Moffat & Mabey, Peter W. Billings, Salt Lake City, for appellant.

D. A. Skeen, John H. Snow, Salt Lake City, for respondent.

WOLFE, Chief Justice.

This is an appeal from a judgment entered on a jury verdict awarding the respondent $4,000 as an accidental death benefit under a certificate of insurance issued by the appellant association to the respondent's deceased husband, Milton J. White. The certificate of insurance provided for the payment of $4,000 if death resulted from accidental injuries alone:

"Provided, however, no * * * sum whatsoever shall be payable in any case whatsoever unless the accident alone results in producing visible, external marks of injury or violence suffered by the body of the member, nor unless the death results wholly from the injury and within one year from the date thereof. * * *

"Accidental death shall be construed to be either sudden, violent death from external violent and accidental means resulting directly, independently and exclusively of any other causes; * * or death within one year as the sole result of accidental means alone. There shall be no liability whatever when disease, defect, or bodily infirmity is a contributing cause of death * * *."

Mr. White died on February 14, 1950 at the age of 63. In his childhood he had been afflicted with rheumatic fever which left him with a mechanically damaged heart. Nevertheless, in his high school and college days he had been active in basketball and track and as an adult had enjoyed fishing, hunting and other outdoor activity. As late as the autumn of 1948, he went on a hunting trip. He had been employed since 1919 at the railroad yards in Ogden, Utah, in going about from train to train arranging for space in mail cars. An incident of his heart condition, when active, was auricular fibrillation or the throwing out by the heart of emboli or fragments of blood clots which are pumped out into the body and may block circulation in an extremity or in a vital organ of the body. In November, 1948, White had consulted Dr. Edward P. Goddard about an ailment which was diagnosed as a splenic infarct or an embolus which had struck the spleen. As part of his treatment, White was given mercuhydrin and thiomerin by Dr. Goddard to assist the heart to compensate for its impairment. Dr. Goddard described White's condition as "congestive heart failure" or a heart which is "no longer able to handle its load." There was also testimony that White's condition was "advanced heart disease" and "serious cardiac disease."

1. Lee v. New York Life Ins. Co., 95 Utah 445, 82 P.2d 178.

In the summer of 1949, White, contemplating taking a vacation trip to Kansas, was examined again by Dr. Goddard who found his heart condition "under control" and advised White that he could safely take the trip. While in Kansas visiting relatives White was struck on the calf of his right leg by the corner of a wooden bench which was being moved by several men. The next day a bruise 2″ x 1″ appeared on his leg and gave him considerable pain which increased in severity and forced him and his wife to cut short their vacation and return home to Ogden. On the trip home, White sat in the back seat of the automobile with his leg extended along the seat. Upon arriving home on September 3, 1949, Dr. Goddard was called and hospitalized him at once, stating that he was suffering from congestive heart failure. Dr. Jennings G. Olson, a heart specialist, was also called in on the case.

In the hospital White's leg grew progressively worse. His lower leg and foot discolored under the skin and took on a spider web appearance. His doctors concluded that there was an impairment of circulation and decided to operate in an effort to remove the obstruction. On September 8th an embolectomy was performed to remove a clot in the artery of the leg but following the operation the leg did not improve, gangrene set in, and by late October his leg was shiny black and the toes curled up as if they were dead. On October 27th the leg was amputated above the knee and a pathological examination of the leg revealed that White had been suffering from obliterating thromboangiitis of the vessels. of the leg, which condition is also known as Buerger's disease. Although Mrs. White testified her husband continued to fail after the amputation, Dr. Goddard testified his recovery was apparently normal. In the early morning hours of February 14, 1950, White was stricken with nausea and after sitting up in bed to vomit, he slipped off the bed as he attempted to lie back down. Dr. Olson was called and on his arrival pronounced White dead, fixing the immediate cause of death as cerebral artery embolism.

An application for benefits was filed by the respondent with the appellant association but the application was denied on the ground that the accidental bump on the leg sustained by White was not directly, independently and exclusively the cause of death but that the heart disease and Buerger's disease were, at least, contributing causes.

At the trial respondent proceeded on the theory that the accidental blow to White's leg (1) reactivated or "lighted up" an inactive heart condition which led to his death, or (2) the blow started an unbroken chain of circumstances which led to his death independently of any contributing cause. Instructions embracing these two theories were presented to the jury and it is the giving of those instructions which is assigned as error by the appellant who contends that the respondent failed to adduce evidence to support a jury finding under either theory.

We find no error in submitting the case to the jury under the two theories above mentioned. Competent evidence appears in the record to sustain a finding that death was caused in either manner. As to the first theory, viz. that the accidental blow reactivated an inactive heart condition which led to his death, Dr. Goddard, who was the only doctor testifying at the trial who had examined White prior to the accident, described White's heart as "damaged" but that his condition was under control; that when he examined White in the summer of 1949 he found nothing which would indicate that he would not live a number of years and he advised him he could safely make an automobile trip to Kansas. On September 3rd when White returned home from Kansas, he was examined by Dr. Olson who found no symptoms of *active* inflammation of the heart but only evidence of heart damage caused by a previous rheumatic condition. On the death certificate Dr. Olson stated that the rheumatic heart disease was inactive. Shortly after receiving the bump on his leg White began to feel pain and was forced to cut short his vacation and return home. Following his arrival home, the condition of his leg grew worse until an embolectomy and later an amputation was performed. While it is true that there was testimony adduced that a person afflicted with Buerger's disease would be more susceptible to adverse effects from a blow on the leg than would a person not so afflicted and that Dr. Wesley E. Peltzer testified that a blow of the nature sustained by White would be "unlikely" to cause gangrene in an extremity in a normal body not afflicted with Buerger's disease, Dr. Olson admitted that trauma or injury "often serves as a starting point of the gangrenous lesions." There was no evidence of the presence of Buerger's disease prior to the time of the accidental blow nor was there any indication from the pathological examination of the amputated portion of the leg how long Buerger's disease had been present. Whether a person like White whose work required him to be on his feet in and around railroad yards would know if he had Buerger's disease does not appear from the record.

Dr. Olson testified that as a result of the embolectomy and the amputation with its attending shock and bedrest, the inactive heart condition could have been reactivated. When the heart disease is active, emboli are thrown off by the heart and may lodge in the brain or other vital organ of the body. All medical testimony at the trial agreed that in their best judgment, White died from the lodging of an embolus in the brain (cerebral embolism).

Considering the instant case under the first theory of the respondent, it is the same in principle as Lee v. New York Life Insurance Company, 95 Utah 445, 82 P.2d 178. In that case the insured sustained an accidental blow to his abdomen. At the time of accident, he had a diseased gall bladder, but there was medical testimony that that condition was not actively progressing;.

that the blow from the accident ruptured the gall bladder, causing the infection to spread and affect the appendix, which required an operation, with death resulting. This court held that the trial court did not err in submitting the case to the jury because there was evidence that the blow had activated a dormant condition which contributed to the death after having been so precipitated by the accident. We concluded that if the jury believed that evidence, the disease was not a direct or indirect cause of death nor a contributing cause within the meaning of the terms of the policy, but the accident which started the mischief and precipitated the condition resulting in death was the sole cause of death.

In respect to respondent's second theory as to the cause of White's death, viz. that the blow sustained to his leg started an unbroken chain of circumstances which led to his death independently of any contributing cause, it has already been pointed out that there was evidence from which the jury could find that the blow to the leg independently of other causes caused the impairment of circulation in his leg which in turn produced the gangrene which necessitated the amputation. Dr. Olson testified that very often blood clots form at the situs of an operation such as at the place where White's leg was amputated. If a blood clot did form at that situs it would be quite possible, Drs. Olson and Peltzer admitted, for the clot to travel to the lungs and there cause death (pulmonary embolism). While, as

before stated, both Drs. Olson and Peltzer testified that it was their best judgment that White died from a cerebral embolism, they did state it was "quite possible" and "quite likely" that death ensued from pulmonary embolism.

Viewing the evidence as a whole and in the light most favorable to the respondent, we find no error in submitting the case to the jury under instructions embodying the respondent's two theories as to the cause of death. The judgment below is affirmed. Costs to the respondent.

McDONOUGH, CROCKETT, HENRIOD, and WADE, JJ., concur.